All rise. Hear ye, hear ye, hear ye. This Honorable Appellate Court of the 2nd District is back in session, pursuant to adjournment. The Honorable Anne Brashner, Your Honor, is here to preside. Please proceed. Your Honor, the first case of the afternoon, Call 2-11-1320, Burke v. Zurich American Insurance Company, on behalf of the Attawan, Ms. Krista Winters, on behalf of the Anna Lee, Mr. Thomas Giscorsky. Are both sides ready to proceed? Yes, Your Honor. You may proceed when you're ready. May I start? Yes, ma'am. May it please the Court, Counsel, Justices, We are here today for a relatively simple case. I'm not going to take the time to recite all the facts and details of it, but I will point out to you a few facts that I believe are significant for today's purposes. My client, Bruce Burke, worked for Zurich Insurance Company from 2001 until 2008. In that period of time, Bruce excelled as a manager. And the reason that we know that he excelled is because each year that Zurich Insurance Company gave out bonuses to their employees, Bruce received a bonus. Now, these bonuses were incentive-based bonuses. They were pursuant to an incentive agreement that was handed out to employees on a yearly basis. 2007 was no exception. In 2007, Bruce received a short-term incentive plan bonus agreement, and in 2007, Bruce worked the entire plan year from January 1st until December 31st, which is defined as the plan year. Did that incentive plan change from year to year in terms of its terms or conditions? I believe that each year it remained relatively the same. In 2003 is when they started a formal incentive plan, and I think they actually started calling it a short-term incentive plan, I want to say in 2004. So no, it wasn't exactly the same each year, but genuinely it was. Did it, to the best of your knowledge, always have the condition that the employee had to be in good standing on the day of payment? Justice Hutchinson, that's a great question, and honestly I don't know the answer to it. I have not seen those past STIP plans. The plan that we're looking at today, and the one that I think is relevant for today's purposes, is the 2007 STIP plan. But that being said, Bruce worked for the entire 2007 plan year. And we know that Bruce worked just as hard in 2007 as he had in all the other years. And the reason that we know that he did is because in March of 2008, Bruce was approved to receive a bonus in the amount of $35,389.15. He was approved for that amount, and that amount was set to be payable to him on April 4th of 2008. How do we know that he was approved for that amount? The way that we know that he was approved for that amount is because it is, in fact, reflected in the record in several different places. But how did he know at the time? I know how we know here, but what was his notice that he was entitled to that bonus? His notice was that as a manager at Zurich, he received an email on March 10th indicating to all of the managers that the year-end assessments have been performed for 2007 and the bonuses have been approved. So that was Bruce's indication that bonuses were, in fact, approved at that time. When did he know about his specific amount of bonus? To be honest with you, we learned the specific amount of the bonus through discovery at the trial court level. Because when did he know? When we received discovery from... Prior to that, he had no idea what his bonus was? He knew that it was going to be 25% of his base because he was a level 7 employee, and that is spelled out in the plan. So he knew it would be around 25% of his base, but no, he did not know the exact dollar and penny amount. Was there another email that happened showing some information about names of persons and numbers next to their names indicating level of budget? Or level of bonus, rather? No, there wasn't. Okay. So getting back to what I was saying, there was that Bruce received... He did receive this email on March 10th, and the bonuses generally throughout the past years... I do know that in past years, the bonuses were always typically paid in March or April for the previous year's performances. So this April 4th payday was very typical of this company to do. That being said, again, the record does show, though, that he was approved for that exact amount. Again, we did obtain that knowledge through discovery, but I would direct the Court's attention to the fact that there is a specific screenshot from the Zurich Human Resources Department, and it's in the appendix. It's A-15 of my appendix, and it's C-658 of the record that actually shows that exact amount that he's approved for. It says approved, but then right next to it, there's a little lock, a picture of a lock that you might use on a locker. And that lock, I believe, is significant because then Rwanda DeWald, who is one of the managers for Zurich, her affidavit, which is also in the record, she explains what that little lock button means. She explains that that lock button essentially locked Bruce out from receiving that payment. She acknowledges that money was approved for him, it was set aside for him, but then prior to actually being paid it, he was locked out of it. And that, Justices, is why we are here today. What do we call that when you take away something that somebody has earned through their hard work? A layperson might call that stealing. Obviously, we know that the law calls that a forfeiture, and we also know that the law hates forfeitures. The very purpose of the Illinois Wage Payment and Collection Act is to prevent against forfeitures. How about their incentive program and the verbiage in their incentive program about how they would distribute and when they would distribute this incentive award? So it would be distributed if he's not on probation and has not violated any company policy as of the time of the incentive award or actually paid out. In Section 8Q, it says award payments will be made in March or April following the planned year. Does it also indicate, though, that you must be in good standing at the time that you receive the fund? Yes, Justice Jorgensen. That is one of the eligibility requirements. That's one of four eligibility requirements, and it is our position today that the entire basically Section 7 of this plan agreement, which sets forth those eligibility requirements, it's our position that those are unlawful forfeiture provisions. We believe that those are unenforceable because they essentially work to take away the bonus that my client had earned. And what I think is significant is that certainly there are cases that support the position that being employed on a certain date to receive a bonus is enforceable. There are certainly cases that do say that. However, I would tender to this Court that in all of those cases, those were pro rata cases. And I would point to the case of McLaughlin v. Sternberg Lanterns. That's right on point with seeking a pro rata share, and I believe this Court actually decided that back in 2009. In that case, it was upheld that, yes, it was fine that we have this employed-upon date, but that was because the employee was seeking to receive a pro rata share of his employment and his bonus was actually based upon his performance. So one of the things that the Court reasoned was, how can he be guaranteed this bonus if we can't even determine what it is, if he doesn't work until the year end, because the bonus was based upon his year-end sales. He didn't work the whole year, so how can you make up what that bonus is going to be if it's too speculative? I would tender that this case is quite different than that because we're not speculating anything. We know that Bruce worked the entire 2007 plan year. We know that he, in fact, was approved for that amount, and we know that they took it away. So it's our argument that those eligibility provisions do function to forfeit Mr. Burke's full year of a bonus. A bonus is considered something in addition to your regular income, usually. I mean, that's common knowledge. And I believe that the same case you were talking about, the McLaughlin case, talks about what, you know, when is a bonus earned. It's an unequivocal promise. Did Mr. – I'm sorry, you're applying. I can't remember his last name. Burke. Did he receive somewhere an unequivocal promise to receive this amount of money? Yes. We actually believe that he did. And when did that happen? When he was given the short-term incentive plan,  in the sense that there is language in this plan that sets forth – there's entitlement language. Specifically, Sections 1 and 5 state that if you receive a rating of 1, you are not entitled to a bonus. Because of that, I think it stands – So it's an earned bonus. It is an earned bonus, absolutely. Because, though, that it says you're not entitled to receive a bonus if you earn a 1, I believe that it stands to reason that if you receive a 2 to 5, which is the other performance ratings, that you are then entitled to a bonus. But then how do you deal with those exclusion provisions that they have in this contract? And the exclusion provisions, are you referring to the eligibility? Yes, precisely. Because they do exclude you if you're on probation and if you aren't good standing at the time the bonus is determined or at the time the bonus is paid out. How do you get around that? I think that you need to look at all of those provisions as a whole. If it was just the provision that you need to be in good standing at the time to receive a bonus, that would be one thing. But I think what is crucial in this case is the fact that the one most important eligibility requirement is that you must be employed by Zerk on the date that these bonuses are paid out. I think that that right there is kind of the clincher of everything because that basically is a condition preceded that the employer has then rendered it impossible for Bruce Burke to fulfill. And I think that there's plenty of case law to support that when an employer does that, that is against public policy and in the nature of a forfeiture. And I would point to the White v. Mantler brothers case as well as to the Camelo Walmart store case. In those cases, it stood for the proposition that, again, these were kind of employed on dates. They wanted the employees to be there by the end of the performance year. And the courts held to withhold that much of their compensation from them is not only unconscionable, but they consider that to be an unlawful forfeiture as well as a penalty. And, again, based back on the principle, this is something that the employee had no control over. They can't control. But he does have control over keeping himself in good standing and staying off probation. He does in that regard, yes, Your Honor. But, again, I think you need to look at all of the STIP eligibility requirements as a whole. Do you find it, given any weight or any less weight, the fact that there seemed to be a whole lot of discretion given to the CEO, even if you are in good standing, even if you're there on that day, it's still within the discretion of the company as to whether or not you get the bonus? And, Justice, that is a good point. And I know that is definitely the point that Zurich asserts one of the reasons why Bruce did not earn his bonus, because it's impossible to earn because it's discretionary. But to that, I would actually counter that, you know, if you actually look closely at the terms of the incentive plan, there is language in there that contradicts that position, that leads you to believe that it's not purely discretionary. For instance, I would point to the fact that there is forfeiture language in this STIP agreement. Section 8N actually specifically says that if an employee voluntarily leaves their employment, they will forfeit any bonus that they may have earned. Now, this causes us to pause, because how can you forfeit something that you haven't earned? So that kind of flies in the face of Zurich's argument that it is a purely discretionary bonus. I would also point to the fact that Section 8K has pro rata language. It says that if you were to leave your employment because of retirement, death, or I believe job elimination, then you're then entitled to a pro rata share of your bonus. Again, if this is a truly discretionary bonus that can't be earned, what is it that you're prorating when you leave? So, again, this is contrary to that assertion. And then, again, I still go back to that entitlement language. I truly believe that by saying you're not entitled to this bonus if you receive a 1, that it does mean that you're entitled to receive it if you get a performance rating of 2 through 5. Lastly, regarding that issue of whether or not this is a discretionary bonus, I would point out that there is no disclaimer in this incentive agreement. And I looked at it, threw it up and down, and there is no express disclaimer that says to the employee that you have no vested right or contractual right or anything like that to a bonus. And I think that's significant because, you know, a lot of the cases that Zurich has relied upon, there are a few of these federal cases, they rely upon these cases to say that, you know, we don't need to pay Bruce this bonus because he didn't earn it. However, these cases are very different than ours because these cases have specific disclaimers. Like in the case of ComDisco, there was actually a big disclaimer that says no vested rights right above the signature line. So right when the employee signed it onto this bonus plan, right there, it was right in front of his face that there was no vested rights to these bonuses. But that's certainly not the case here. Arguably, Bruce's rights vested in this bonus on December 31st when he completed the plan year. And then... But they don't determine whether the bonus is going to be paid until sometime into the following year, and it's based upon not just one employee performance but corporate performance and then by divisions, I guess. That's absolutely correct, yes. Okay. So they work for the entire plan year, and then after that year's over, the company assesses the profits they've made and the individual performance of each person. And then, you know, even outside of this STIP agreement, I would point out that just, again, basic public policy, basic good faith and fair dealing says that when somebody earns such a large portion of their salary, you just can't withhold that from them and say that it's discretionary. And, again, I think that White v. Mandel Brothers and the Camillo case enforced that. In this case, if Bruce received his bonus, which he should have, his income for 2007 should have been somewhere around $176,000. Because he didn't receive that bonus. It was somewhere around $140,000. So it's 20% of his income that he didn't receive. And to say that that's discretionary just flies in the face of public policy and everything that, you know, the Wage Payment Collection Act stands to protect. Are there any cases setting a bright line number that 10 is not enough, 10% is not enough, 15% is too much? I haven't seen necessarily a bright line number. I know that in the Camillo case, it was 25% of his total income. And then I know in the Mandel Brothers, that was also a significant portion. I will comment that Wilson v. LaSalle Manufacturing, which is a case that Zurich heavily relied upon, because they did employed upon provision, the court in that case actually said, you know, this bonus does not represent a significant portion of his total salary. And, again, I'm not sure what that number was, but they did make that distinction. I guess my next thing that I would like to address then is to get a little bit more into these four eligibility requirements. Again, you know, we have to kind of look at, you know, what is the meaning of an earned bonus? And the Bill and Wage Payment Collection Act does not define that. It really doesn't. So what I think we have to do is look at the case law. And there's not a whole ton of case law really that addresses the meaning of it either. Camillo is the first case that kind of talked about it, and they said that an earned bonus is likened to vacation pay. It should be treated the same as vacation pay. And we all know that vacation pay is specifically mentioned in the Wage Payment Collection Act as being something that cannot be forfeited. So Camillo kind of takes it the next step and says, well, we should treat earned bonuses that same way. Counsel, actually, the buzzer that went off was your time limit. So if you want to finish up your thought and then have a seat, you'll have a chance to reply. In conclusion, Your Honors, we'd be asking that this court reverse the trial court's decision. And because the parties have stipulated that there's no genuine issue of material fact, we would ask that it be remanded to the court with direction to determine the damages that are owed to Bruce Burke. Thank you. Counsel, do you wish to respond? I may please the court. My name is Thomas Piskorski, and I appear on behalf of Defendant Appellee Zurich, who is called Zurich for short. I think the beginning point ought to be under the Illinois Wage Payment Collection Act, the applicable regulation, because this case is about earned bonus. What does that mean? Section 300.5 of the applicable regulations defines it as, quote, when an employee performs the requirements for a bonus in a contract or an agreement between the parties. That is the definition of an earned bonus under the statute under which Mr. Burke brings his claim. The Wage Payment Collection Act doesn't create any bonus obligations, and employers are not obligated to provide any. The only obligation is, whatever is in a contract or agreement, you are required to comply with that contract or agreement. Isn't that agreement that Mr. Burke has signed, or the agreement of the company, aren't there a lot of conflicts, a lot of conflict within one section, the other section, I mean, Section 8? There are a lot of inconsistencies, aren't there? And when we have inconsistencies, what do we do? I don't see the inconsistencies, Your Honor. What I do see is in Section 7, the critical section for purposes of this case, the eligibility criteria. Those are crystal clear. There's no dispute about what they say, no dispute that Mr. Burke understood them. He may not like them, but the eligibility requirements are pretty unambiguous in terms of what an employee must achieve. Some of the other provisions, for example, I know Mr. Burke's counsel talked about Section 8N, but it talked about forfeit of a potential payout for a particular group of employees who voluntarily terminate or resign. So the plan wanted to be crystal clear on that point, if there was any concern about that. But the plan, in terms of its material provisions applicable to this case, there's really no misunderstanding about it. Isn't there one provision, though, and I can't identify it specifically, that says you have to be in good standing on the date it's determined or paid? Doesn't that create a possibility of two different dates? No, Your Honor. You're talking about Section 7, and that's in Paragraph 8 as well. That's in Paragraph 8, but it talks about you must be actively working throughout the performance year and at the time of payout. C talks about you have to not violate company policy, and D talks about being in good standing at all times, including the time of the payout. So I think those provisions, if Your Honor was referring to those, are pretty clear. I think maybe you're talking about Section 7C, where it says you have to not violate company policy as of the time the Senate boards are decided or actually paid out. Right. So why do we have that section there, and we have these other sections being so definitive on the date of payout? What's the difference? I'm not sure there is any difference other than a reaffirmation. Well, it's confusing. I disagree, Judge. I don't think anybody reading Section 7 requirements could in any way doubt that I need to be in good standing and working on the day the payment is made. On that critical point, I can't imagine any reasonable person reading this saying, geez, I'm not clear. Do I have to be in good standing on the payment date, or if I get canned, terminated before then, do I run the risk of losing my bonus? Of course you do. That's the plain reading of that provision. Well, how do you square that with the Wage Act, when he earned the bonus? I mean, it was basically an unequivocal promise to pay him. How do you explain that? There was no unequivocal promise. To the extent there was one, the promise will be we will consider you for a bonus if you meet these participation criteria set forth in Section 7 of the STIP. And again, the Wage Payment and Collection Act says a bonus is earned when you perform the requirements of the bonus plan. Those are the requirements. There's no dispute in this record. Mr. Burke candidly admits he didn't meet three of the four requirements. But the bonus was earned, it just wasn't paid. No, Your Honor, I completely disagree. One of the earning elements, one of the requirements was you have to be working and working well and in compliance with company policy and good standing up to that date. That's a performance requirement. So when he received the e-mail in March that said he had earned, everybody earned the bonuses, that wasn't earned at that point, in your interpretation? Not only interpreted, but that e-mail, and Your Honor, I think asked about it earlier, it's at page 11 of our brief. It's in Mr. Burke's appendix, it's 12 to 14. The e-mail didn't guarantee anybody. It just said, here's some calculations. They need to be approved. At that point, they're not even approved. Because each manager, including Mr. Burke, who was a manager and understood how the stiff worked, had the right under the discretionary plan to say, no, I'm not giving that bonus to this person or that person for these reasons. In Mr. Burke's case, it's even more crystal clear because he wasn't working. He got terminated for violating company rules before the payout date. And under section seven, that's death for him in terms of an earned bonus claim. So there's no room for a pro rata payment here? Correct, Judge. There is not. Because the plan, and it's absolutely appropriate and legitimate. If I'm the employer, I want to make sure my employee, this is an incentive plan. I don't have to give it. But in exchange for a substantial potential benefit, I expect certain performance and conduct. And I stated it clearly. I want it up to this point in time. That's my performance requirement. I may measure a part of the bonus later on on the calendar year. But for purposes of the requirements under the agreement, I've specified as an employer, from January 1 through the date of payout, you've got to be performing properly and, again, in the words of the plan, in good standing. That's a performance requirement. Let me ask you another question real briefly. I noticed one before your opponent sat down. She said, she pointed out to us that it was stipulated that there is no genuine issue of material fact. And is that what your understanding is? I believe so, Your Honor. I think both parties, because I do believe the material facts are not in dispute. But aren't you both disagreeing here today? I mean, you are. I mean, bottom line, you're disagreeing whether there was an unequivocal promise. She thinks there was, and you said there wasn't. Well, we may disagree, Your Honor. The question is whether there's a genuine dispute over that. In our view, based on the plain language of the agreement and under summary judgment standards, the only reasonable reading as a matter of law, by the way, contract interpretations are questions of law for the court, the only reasonable, sensible reading of the stip results in Mr. Burke not receiving a bonus. I apologize. I forget which justice asked the question about discretionary. But discretionary language appears explicitly in Sections 8P and 9 of the plan. The word discretion is there. It also appears in Section 7D. Section 5 even uses words could be awarded, not will be awarded, not shall be awarded. It says could be awarded. Nothing in the plan creates the unequivocal promise that this court held in McLaughlin is required. Well, the plan creates the concept of the bonus, but there were two communications that occurred after the plan was identified, the one being the e-mail and the other being the screenshot that said approved. So how can we disregard those and not look at those and only look at the plan? Well, because the plan defines it. I'll assume that his number was internally approved but yet not final. But the plan says until payout, we have the right to determine that your performance hasn't met the standards. And in this case, there's no dispute. His performance didn't meet the standards because his employment was terminated for violation of company policies. So bottom line, your point is the employee has to continue to perform under the contract up until it's actually paid out. Failure to do so results in a loss of bonus. Is that true? Exactly, Your Honor, because he, well, not loss of bonus. He never had the bonus. He doesn't get it. Correct. He doesn't get it. Because he is not, I'm using the words of the reg, and that's critical. He hasn't satisfied the requirements for a bonus in the contract or agreement between the parties. That's the beginning point. That's the end point. A couple of references to Zerk denying good faith in terms of his employment termination. I totally disagree with that. Mr. Burke is solely responsible for his failing to satisfy the performance standards. Zerk didn't make up his conduct. Zerk didn't make up the complaint from the employee. It was his violation of policies that resulted in him losing his job before payout date, which may then result in him not earning a bonus. But there's no fault on Zerk's part. We didn't make it impossible. Mr. Burke made it impossible for himself by failing to comply with all company policies and, quite frankly, getting himself terminated before the payment date. And you don't believe that that contract is in conflict with the Wage Act? Not at all. Not at all. Because, again, the Wage Payment Collection Act gives the employer the right to set the requirements for the bonus, whatever they may be. And in this case, the employers, rightfully and reasonably, said, I want people performing, including complying with policies, up to this point in time. That's the requirement. The allegations that caused the termination, do we know if they occurred in the year of 2007 or they occurred in the year of 2008? The complaint came in 2008. But was there some investigation by Zerk? My recollection, Your Honor, is the conduct resulting in the termination did not occur in 07. I think it occurred- Neither of them, because we have two allegations. I believe that is correct, Judge. I believe the conduct, the violation of company policies, which resulted in Mr. Burke's termination, occurred in 08. But they occurred before the payout date and, again, under the planning step. You've got to be performing. By performing, I mean including complying with company policies up until that point in time. As an employer, I have the right to define that as a key date. I can set any requirement I feel appropriate for that bonus. And this one, I don't think anybody can disagree. It's perfectly reasonable for an employer to say, I want my people under this incentive plan, because Your Honor made that point earlier, this is an extra benefit. The employer doesn't have to give it at all. So I can attach appropriate, reasonable conditions. And the condition, in my mind, that's reasonable and appropriate is I want you performing satisfactorily up until that date of payment. But if the corporate financial situation that's being considered for this bonus occurs in 2007 and all the work that goes into that bonus occurred in 2007, how is it not a forfeiture just per se to take that away for something that happened the following year? For example, Your Honor, if under Mr. Burke's position, on January 1, he had an earned bonus. No, he didn't. I'm sorry, Judge. Well, I mean, there might be a question based upon what counsel argued that on March 10, during that screenshot, so that we're a little farther down the road. I don't think she ever said January 1. Her first date outside of 2007 was March 10. I thought I heard that as long as you finish the calendar year, you somehow earned a bonus. That can't be. And on that point, while I may look to the calendar year to do the arithmetic calculation, that's okay, but my requirement for actual earning anything requires you to go further in time to comply with my requirements. And the requirements, one of the requirements was good standing. Was Mr. Burke ever told that he had been approved to receive a bonus totaling $35,380? There is no record evidence of that, as I recall from the record, because he never was told because he never did get final approval. His boss never finally approved it because the allegations regarding alleged violations of company policy came up. Well, he was, if I recall the facts correctly, he was supposed to meet with his manager on the 14th, and he was fired on the 13th? I believe those dates are right, but the investigation started earlier than the 13th, obviously. Were there any other options that Zurich could have employed concerning discipline that would not have resulted in firing? Well, your question is could. I suppose the company could have said a disciplinary action short of termination could be done. However, that's not the question. The question is whether he was actually terminated. And in this case, he was, and moreover, the grounds for termination, which have never been contested by Mr. Burke. That's a given that the legitimacy and the justifiable nature of the termination has never been challenged. There's no question that his conduct was bad, and termination was absolutely appropriate in response to what he did. He never even challenged his termination. This lawsuit, there's no challenge that he was wrongfully discharged. That's a given. So it's a given that he wasn't in good standing as of the time of the payout, and therefore, under Section 7 of the STIP, he's not entitled to it. I'll give you a couple minutes if you want to just finish up your thought. I will, Your Honor. The case, as cited, Camilla, we distinguished it in our brief. The contract language was a non-equivocal promise there. It says will be paid. It was a length of service bonus. The White case, by the way, had nothing to do with earned bonus. It dealt with liquidated damages versus a penalty. So White, in the case that Mr. Burke relies on and the circuit court touched upon, has no bearing on this. I think if I can close out, what Mr. Burke is really saying is I want the court to rewrite the STIP. For example, he thinks good standing during the calendar year should be the requirement. That's not what the STIP says. He says that it's good standing at the time the bonus amounts may be considered. That's not what the STIP says. He talks about as soon as the calendar year ends and the employee is still employed, that requires me to get an earned bonus. That's not what the STIP says. His claim boils down to contending that the Wage Payment and Collection Act requires the court to gut the STIP, rewrite it to his liking, by eliminating requirements which he didn't meet. That's not what the Wage Payment and Collection Act is about. The court is supposed to enforce the agreement, not rewrite the agreement. We ask that the judgment be affirmed. Thank you, Your Honor. Thank you very much. Do you wish to offer a reply? Yes. Justices, I would briefly touch on an earlier question as to whether or not there are genuine issues of material fact in this case. And I would tender to the court that there are not. I know at the trial court level, both parties filed a motion for summary judgment, hence acknowledging that there weren't material issues of fact. And the reason I say that is because all parties have acknowledged that Bruce was in good standing for 2007 and that he worked the plan year. All parties have acknowledged that he didn't fulfill those eligibility requirements. We've acknowledged that. I think what is in question is not necessarily an issue of fact, but more of law. And I think what this court needs to look at, I think what's important in this case is we need to distinguish the difference between earning a bonus, I guess, and being eligible for it. I think that that's kind of what Zerk's confusing. But it wasn't Zerk clear in the contract that earning a bonus and being eligible are two different things. That if he's not eligible for a bonus that he, in your opinion, he may allegedly have earned if he didn't do what they expected him to do, be in good standing. So how are they confused or how are they not? I think they're trying to say that they're one in the same. I think they're saying he didn't earn that bonus because he wasn't eligible for it on the date that it was paid. Well, that's not what I heard him say. I thought that I heard him say that nobody, that no one earned the bonus until they made a determination as to what the bonuses would be. He was just saying, oh, you know, this is going to be, we've met this dollar amount. But nobody really earned the bonus until that bonus was paid out. Did anybody ever say to your client, Mr. Berg, you have earned a bonus in the amount of $35,000, blah, blah, blah, which will be paid out later on? Nobody outrightly said that to him. But I know that throughout the performance year, he did receive ratings from his managers. And throughout the year, he did receive ratings of three and above. I know that he was given this stip agreement. But after he earned those ratings, then he allegedly, it sounds to me agreeably, agreed by everyone, sexually harassed somebody. So then if he were to get ratings again, they weren't going to be what they were before, correct? Justice, I actually, that is inaccurate. Bruce Berg vehemently denies any of those sexual harassment charges. Okay, so he denies them. I don't know, but your opponent said that's not an issue here. Exactly. The long and short of it is if he was to be evaluated in March, when it was time to be handed that bonus, he would not have been getting the same marks, correct? For March, yes. So isn't it within the discretion of the CEO or within the discretion of the company as to whether or not that bonus would be paid out depending upon his standing or his behavior at the time? Yes, if we were asking for a pro-rata share of his bonus for 2008. If we were here today asking for his bonus for January, February, and March when he was employed, then yes, I think that probably would be significant. The stip doesn't provide for that except in a very limited case, so why would you be asking for that? You couldn't do it with a straight face and get by 137. So we're not talking about that. Well, I'm talking about the fact that being in good standing I think is relevant for 2008. The plan here, this bonus… Well, the counsel raised it, really capsulized it, and said you're asking us to rewrite this agreement. And saying that, well, you know what, even though this is what the agreement says, it really meant all terms and conditions finished as of December 31st as long as your client worked all year. How do we justify that based on reading this whole contract? Sure. The way that we justify that is by acknowledging that these provisions are disguised forfeiture provisions. Yes, they're in this agreement. They might have been in it for all the last couple of years. But at the end of the day, they're forfeiting what he worked hard for in 2007 to earn. All year long there was a carrot on a stick, and Mr. Bruce Burke chased after it so that he could earn this bonus. And, you know, he completed the year, he earned it. And then because of these forfeiture provisions, I'm sorry, the eligibility requirements in Section 7, they've taken it away from him. Well, did he work hard in the year that nobody got a bonus because financially they weren't capable of, in the manager's minds, they weren't capable of providing a bonus? I would presume that he worked just as hard that year as well because, again, I think that year there was the plan. But, again, that year nobody received a bonus, and I think that's different to – I think that he received – the right to get that bonus, I believe, vested at the end of the performance year. That vesting I don't think necessarily guaranteed he was going to get a bonus because, yes, you're right, the managers had to then assess everything and determine whether or not anyone was going to get a bonus. But once that determination was made, the bonuses were given out, Bruce's right already vested in that bonus. And just because there's these eligibility requirements that are unlawful, I think, forfeiture provisions, it doesn't mean that Bruce shouldn't be entitled to them under the Wage and Employment Act. So, bottom line, you're saying here's the contract, but you want us to take out everything that you believe to be a forfeiture, what's left clearly entitles your client to his bonus. Is that it in a nutshell? Essentially, yes. Okay. That was your buzzer, so I'll give you just a moment to make a final remark. Your Honors, again, we've just asked that you reverse the trial court's decision that granted their motion for summary judgment and remand it with direction to determine the client's damages. Thank you. Thank you very much. We will be at a recess until 2 o'clock.